UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                          No. 15-cr-182 (DWF/LIB)

          Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

William Ike Libby, Jr.,

          Defendant.

       This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon Defendant William Ike Libby Jr.'s ("Defendant") second group of pretrial motions.[1] The Court held a motions hearing on January 8, 2016, regarding Defendant's pretrial motions.

       At the motion hearing, Defendant withdrew his Motion for Discovery Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, [Docket No. 55]; Motion for Release of Brady Materials, [Docket No. 56]; Motion for Disclosure of 404(b) Evidence, [Docket No. 57]; Motion for Disclosure of Giglio Material, [Docket No.58]; Motion for Discovery of Expert under Rule 16(a)(1)(G); Motion to Retain Rough Notes, [Docket No. 59]; Motion for Disclosure of Jencks Material, [Docket No. 60]; and Motion for Counsel to Participate in Voir Dire, [Docket No. 62].

---

[1]The group of pretrial motions that were addressed at the January 8, 2016, motions hearing was the second set of pretrial motions filed by the Defendant. Defendant initially filed a Motion to Suppress Evidence, [Docket No. 13], on July 7, 2015. The undersigned issued a Report and Recommendation, [Docket No. 20], regarding that motion on August 10, 2015. The Honorable Donovan W. Frank, District Court Judge of the United States District Court for the District of Minnesota, adopted the Report and Recommendation on September 16, 2015. (September 16, 2015, Order, [Docket No. 21]). On October 19, 2015, Defendant was appointed new counsel. (See Orders for Appointment of Counsel, [Docket Nos. 43, 44]). Defendant was subsequently allowed until December 8, 2015, to file additional pretrial motions. (November 17, 2015, Order, [Docket No. 49]). On December 7, 2015, Defendant filed the pretrial motions that were brought before the Court at the January 8, 2016, motions hearing. ([Docket Nos. 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62]).

(Minutes, [Docket No. 69]; January 8, 2015, Motions Hearing, Digital Recording at 10:35:10 a.m.-10:39:15 a.m.).

Following an evidentiary hearing on January 8, 2016, on Defendant's remaining motions, the parties requested an opportunity to submit supplemental briefing which was completed on February 1, 2016, and Defendant's Motion to Suppress Statements, [Docket No. 52]; and Motion to Suppress Unlawful Search and Seizure, [Docket No. 53], were then taken under advisement by the undersigned on February 2, 2016.

For reasons discussed herein, the Court recommends that both Defendant's Motion to Suppress Statements, [Docket No. 52]; and Defendant's Motion to Suppress Fruits of Unlawful Search and Seizure, [Docket No. 53], be **DENIED**.

## I.   BACKGROUND AND STATEMENT OF FACTS[2]

### A.  Background

On June 9, 2015, Defendant William Ike Libby, Jr. ("Defendant"), was indicted with one count of being a felon in possession of a firearm – armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Indictment [Docket No. 1]).

### B.  Facts

On April 19, 2015, Investigator Daniel Skoog of the Becker County Sheriff's Department received information from a confidential informant ("CI") indicating that the CI had seen Defendant in possession of methamphetamine and a firearm within the preceding twenty-four (24) hours.  (Govt.'s Ex. 1, Application at 2; <u>see also</u> August 3, 2015, Motions Hearing, Digital

---

[2] The Court has drafted the Statement of Facts on the basis of the evidence presented at both the August 3, 2015, motions hearing and the January 8, 2016, motions hearing. (See <u>United States v. Bronner</u>, No. CRIM 08-395(RHK/JJG), 2009 WL 1748533, at *3 (D. Minn. June 19, 2009) (basing ruling on motion to suppress filed after an initial suppression hearing on evidence submitted at the initial evidentiary  hearing, as well as, evidence submitted at the second evidentiary hearing held after the defendants were allowed to file the additional suppression motions).

Recording at 2:05:20 p.m.). According to the CI, the Defendant had told the CI that he had active warrants for his arrest. (Govt.'s Ex. 1, Application at 2). Investigator Skoog independently confirmed that there were in fact at that time active warrants for Defendant's arrest. (Id. at 3).

The CI provided Investigator Skoog with two telephone numbers that the CI represented had then recently been used by the CI to call and speak to Defendant. (Id.). At approximately 6:00 p.m. that evening, Investigator Skoog informed Minnesota Bureau of Criminal Apprehension Special Agent William Bennett ("SA Bennett") that the CI had just used one of those telephone numbers to converse with Defendant. (Id.). SA Bennett confirmed that the two telephone numbers provided by the CI were associated with cellular telephones for which there were active accounts with a cellular telephone service provider. (Id.).

Using the information provided by the CI, SA Bennett applied for and obtained a state court warrant to track the cellular phones associated with the two telephone numbers provided by the CI. (Gov't Ex. 1, Order). During the early morning hours of April 20, 2015, Investigator Skoog received additional information from the CI that Defendant was at a residence located at lot 17 in the Country Manor Trailer Park and that Defendant may be driving a Chevy Tahoe. (August 3, 2015, Motions Hearing, Digital Recording at 1:42:05 p.m.; 1:54:35-1:55:40 p.m.; 1:57:50 p.m.). Using cellular tracking technology, SA Bennett located the cellular phones associated with the numbers provided by the CI also at lot 17 of the Country Manor Trailer Park. (Id. at 1:36:15 p.m.; 1:42:20 p.m.; 1:54:35-1:55:40 p.m.).  A Chevy Tahoe was parked at the trailer home at that location. (Id. at 1:38:20 p.m.; 1:38:55 p.m.). SA Bennett set up surveillance of the trailer home on lot 17 and took a position approximately 300 yards away to watch for vehicles leaving the residence. (Id. at 1:38:35 p.m.). Investigator Skoog also took a position watching the trailer home and asked a patrol officer of the Becker County Sheriff's Department

to be in the area in order to be ready to intercept vehicles leaving the residence. (Id. at 1:43:00 p.m.; 1:55:00 p.m.; 2:05:25 p.m.).

While SA Bennett and Investigator Skoog were watching the trailer home at lot 17, the Chevy Tahoe was driven away from the property. (Id. at 1:55:35 p.m.). After the Chevy Tahoe was driven away, SA Bennett and Investigator Skoog immediately drove by the trailer home on lot 17, and using cellular telephone tracking technology, they determined that the tracked cellular telephones were no longer at the residence. (Id. at 1:36:15 p.m.; 1:55:35 p.m.-1:55:45 p.m.). Believing that the cellular phones and Defendant were in the Chevy Tahoe, Investigator Skoog directed the available patrol officer, Sgt. Bachman, to stop the Chevy Tahoe. (Id. at 1:57:15 p.m.).

Sgt. Bachmann began following the Chevy Tahoe and pulled up behind it, intending to activate his squad car's emergency lights to initiate a stop of the vehicle. (Id. at 2:02:55 p.m.). Moments before the Sgt. Bachmann activated his lights, however, the Chevy Tahoe began to pull into a driveway at 728 Richwood Road. (Id. at 1:44:00 p.m.; 2:03:15 p.m.). Before the Tahoe came to a complete stop, Sgt. Bachmann activated his emergency lights. (Id. at 2:30:15; 2:05:55 p.m.). As Sgt. Bachmann was bringing his vehicle to a stop, the driver of the Chevy Tahoe got out of the vehicle and immediately fled the scene on foot. (Id. at 2:03:40 p.m.-2:04:10 pm.). Sgt. Bachman could see that the fleeing driver was wearing a dark colored sweatshirt or jacket and was carrying a gray patterned backpack with a blue stripe. (Id. at 2:03:40 p.m.-2:04:10 pm.).

Sgt. Bachmann determined that there was a passenger still in the Chevy Tahoe, and he remained with the passenger while other officers set up a perimeter.  (Id. at 1:44:15 p.m.; 2:07:00 p.m.). The passenger confirmed to Sgt. Bachmann that it was Defendant who had fled the Tahoe. (Id. at 2:07:30 p.m.).

SA Bennett and Investigator Skoog eventually located the Defendant lying on the ground next to the side of an outbuilding at 729 Anders Avenue, approximately 200 feet away from the Chevy Tahoe, and it was there they arrested him shortly after 1:00 a.m. (Id. at 1:44:30 p.m.-1:45:45 p.m.; 1:56:55 p.m.; January 8, 2016, Motions Hearing, Digital Recording at 10:51:10 a.m.). Investigator Skoog had his weapon displayed while Defendant was being arrested and placed in handcuffs. (Id. at 10:50:30 a.m.-10:51:05 a.m.). However, the officers did not need to use physical force when taking Defendant into custody. (Id. at 10:50:35 a.m.-10:50:58 a.m.).

Officers later discovered a backpack that was thought to belong to Defendant on the east side of a wooden fence in the backyard of 728 Richwood Road, approximately 65 feet from where Defendant was arrested. (August 3, 2015, Motions Hearing, Digital Recording at 1:44:40 p.m.; 1:45:00 p.m.). Officers also discovered a handgun lying openly in the grass of the backyard of 729 Anders Avenue. (Id. at 1:49:30 p.m.-1:49:50 p.m.). Sgt. Bachmann later recognized the backpack that the other officers had found as the one he observed being carried by Defendant when he fled on foot from the Chevy Tahoe. (Id. at 2:04:45 p.m.). Officers later searched the contents of the backpack and found a second firearm inside, along with methamphetamine and other narcotics, as well as personal items identifying Defendant. (Id. at 1:50:55 p.m.-1:51:15 p.m.; January 8, 2016, Motions Hearing, Digital Recording at 11:33:10 a.m.).

Following his arrest on April 20, 2015, Defendant was transported to the Becker County Law Enforcement Center where he was placed in a holding cell. (January 8, 2016, Motions Hearing, Digital Recording at 10:51:20 a.m.). Investigator Skoog and other officers subsequently interviewed Defendant three times. (See Id. at 10:51:45-10:59:00 a.m.).

The first interview took place beginning at approximately 1:35 a.m. on April 20, 2015, when Investigator Skoog and White Earth Police Sergeant Chris Larson began interviewing

Defendant in an interview room in the Becker County Sheriff's Office. (Id. at 10:51:45 a.m.; 10:52:20 a.m.). Investigator Skoog was not in uniform, but was armed during the interview. (Id. at 11:08:30 a.m.). Sergeant Larson was in uniform and armed as well. (Id. at 11:08:47 a.m.). Investigator Skoog later testified at the January 8, 2016, motions hearing that he could not recall whether Defendant was handcuffed during the interview, but that it is standard practice to have individuals detained in the Becker County Jail to be brought to interviews in handcuffs. (Id. at 10:52:55 a.m.; 11:17:30 a.m.-11:17:55 a.m.). The interviewing officers did not deny Defendant food, water, or restroom breaks. (Id. at 10:53:20 a.m.).[3]

Investigator Skoog had met Defendant several years before the interview, he was aware of previous cases investigated by the Becker's County Sheriff's Officer in which Defendant was involved, and he knew at the time of the interview that Defendant had previous felony convictions. (Id. at 10:54:00 a.m.; 11:04:50 a.m.-11:05:45: a.m.). Investigator Skoog had previously heard that Defendant has used narcotics, and in fact, Defendant told Investigator Skoog during the first interview that he uses methamphetamine. (Id. at 11:06:45 a.m.). Investigator Skoog did not ask Defendant whether he was under the influence of narcotics or alcohol at the time of the interview. (Id. at 11:06:55 a.m.). However, to Investigator Skoog, Defendant appeared to understand the officers' questions. (Id. at 10:53:05 a.m.). Investigator Skoog later testified at the January 8, 2016, motions hearing that Defendant was pleasant and cordial throughout the first interview. (Id. at 10:53:35 a.m.). Investigator Skoog did not make any threats to get Defendant to answer his questions. (Id. at 10:55:55 a.m.).

---

[3] The interview room was approximately eight feet by ten feet in size, and contained a table and four chairs. (Id. at 10:52:50 a.m.-10:52:15 a.m.). The room is equipped to make video recordings, but the officers made only audio recordings of all three interviews. (Id. at 11:18:10 a.m.-11:18:25 a.m.).

The officers began the first interview by asking Defendant if he was willing to talk to them.  (Govt. Ex. 11 at 00:22).  Defendant then asked for and was provided with some water.  (Id. at 00:22-00:48).  Investigator Skoog then told Defendant that he was in custody, and that before the officers could speak to Defendant, they would have to read him the Miranda warnings.  (Id. at 00:55-1:05).  Investigator Skoog then read Defendant the Miranda warnings.  (Id. at 1:35-1:53).  After Defendant was read the Miranda warnings, the following exchange occurred:

Skoog:        Having these rights in mind, are you willing to talk to me?

Defendant:    If you're willing to help me out, I'm willing to help you out, sir.

Skoog:        Okay.  Well, ah . . . obviously, I need to know what you know though before I can do anything like that, but I'm just wondering, are you willing to talk to me and answer any questions or answer my questions?

Defendant:    Um.  Yes, sir.

(Id. at 1:53-2:24).

Investigator Skoog asked, and Defendant answered, a series of questions about the passenger who had been in the Chevy Tahoe, about the type and quantity of the narcotics that had been found, the firearms that had been found, and Defendant's actions leading up to the arrest. (Id. at 2:25-6:50). The following exchange then occurred:

Skoog:        Okay.  So who gave you the bag?

Defendant:    Hmmm, um. . . I really don't want to say too much, sir, but I know – I just want to know if you guys can help me or not, 'cuz I don't want to give you too much information then if you're not willing to help me, um, well, you know.  I definitely willing to help you guys out if you're willing to help me, so…

Skoog:        You're willing to help us out?

Defendant:    Yes, sir.

Skoog:        Okay and, but I need to know what you can do to help us out.

Defendant:     Well, I could probably, um, direct you to where stuff is and who has it and who's… who's… who's dealing and I could probably make a couple buys, whatever.

Skoog:         Okay.

(Id. at 6:55-7:24).

Defendant then made several comments indicating that law enforcement should detain the passenger of the Chevy Tahoe. (Id. at 7:24-8:13).  Investigator Skoog then asked Defendant whether he was willing to work with or help the officers, to which Defendant replied "Yes, sir." (Id. at 8:07).  Investigator Skoog then returned to asking Defendant questions about who he was staying with, the identity of Defendant's probation officer, and the source for the narcotics that had been found. (Id. at 8:13-9:18). The following exchange then occurred:

Skoog:         Like I said, we need to know what you know before obviously, we were willing to … obviously we're not going to use your information. It's probably information we already know, but you know, we need to know what you can do in order to…

Defendant:     I can do whatever you need me to do… me to do.  I just gotta make sure that [inaudible] gets out to where I've been arrested or anything like that [inaudible] where it can't look like I've been picked up.  You know what I mean?  Like m-might be a little better [inaudible] I got away [inaudible] for me to do this, because [inaudible] other guys know me from hiding here and there, hiding there and whatnot, but I can get you some heroin, I'll just get you some [inaudible]

(Id. at 9:20-10:05).

Investigator Skoog then asked, and Defendant answered, a series of questions regarding the amount and source of narcotics that Defendant could obtain, the reason Defendant had been found with firearms, the source of the firearms, and Defendant's telephone numbers. (Id. at 10:05-17:58). The following exchange then occurred:

Skoog:         Who is that someone?

Defendant:     Umm… sir, I need to know for sure if you can help me out, because I don't – I don't want to be just telling you all this information for nothing, sir.

Skoog:        Well I – I like I told you, I can't make any promises. The only thing I can do is I
              need to know what you need – you – what you know and then I can go back and –
              and, ah –

Defendant:    Is this all being recorded?

Skoog:        What's that?

Defendant:    Is it all being recorded?

Skoog:        No.

Defendant:    [inaudible] So your phones not out there for no reason?

Skoog:        It's – no.  Just an iphone.

(Id. at 17:58-18:30).

Defendant then asked Investigator Skoog to turn his phone off and put it away. (Id. at
18:30-18:50). Investigator Skoog then turned off the phone. (Id. at 18:55). The following
exchange then occurred:

Defendant:    Now what do you want to know sir?

Skoog:        Well, when – what do you – what do you know?

Defendant:    Well, I can tell you [inaudible] where everything is coming in from and who is
              doing what, this and that, and I can go buy what I need to buy and – and…

(Id. at 19:00-19:17).

Investigator Skoog then asked, and Defendant answered, a series of questions about
individuals whom Defendant had mentioned earlier in the interview and where Defendant had
obtained the firearms that had been found. (Id. at 19:18-23:55). Approximately twenty-four
minutes into the interview, Investigator Skoog terminated the interview, saying "Well, I'm gonna
talk to my partner and I'll get back to you, okay?" (Id. at 23:55).

During the time between the first and second interviews, Investigator Skoog did consider
but did not reach a decision whether to pursue a cooperation agreement with Defendant. (Id. at

9

11:17:15 a.m.; 11:30:15 a.m.). At the time, Investigator Skoog was aware of a then recent theft of guns, drugs, and a significant amount of money that had occurred in the area. (Id. at 11:32:00 a.m.-11:32:25 a.m.). He believed that Defendant had been involved with the theft in some way, and that Defendant may have had some information about the theft.   (Id. at 11:32:25 a.m.-11:32:50 a.m.). However, because of the late hour at which the interview was concluded, Investigator Skoog did not speak to a county prosecutor regarding the possibility of reaching a cooperation agreement with Defendant before he interviewed Defendant a second time. (Id. at 11:17:25 a.m.; 11:36:10 a.m.). Rather, Investigator Skoog returned home to sleep before returning to work. (Id. at 11:36:15 a.m.).

Following the first interview, Defendant was taken to the Becker County Jail where he was placed in a holding cell rather than in with the general population. (Id. at 11:16:45 a.m.; 11:27:40 a.m.).  Defendant was not given access to a telephone during this time. (Id. at 11:16:50 a.m.). Investigator Skoog later testified that he was not personally aware whether Defendant was given food and water during this time, but that the Becker County Sheriff's Office typically ensures that the needs of individuals who are in custody, including food and water, are met. (Id. at 11:17:00 a.m.; 11:29:40 a.m.).

When an individual is placed in with the general population, the Becker County Sheriff's Office publishes the individual's name on an online "inmate custody list." (Id. at 11:31:00 a.m.). Investigator Skoog had Defendant kept in a holding cell between the first and second interviews rather than in with the general population because he thought it was possible that Defendant could cooperate with the police as an informant, but Investigator Skoog was not then sure whether a prosecutor would allow him to pursue a cooperation agreement with Defendant. (Id. at 11:30:25 a.m.-11:31:34 a.m.).  However, Investigator Skoog did not communicate to Defendant

why Investigator Skoog had kept him in a holding cell rather than with the general population. (<u>Id.</u> at 11:35:30 a.m.).

Investigator Skoog interviewed Defendant a second time in the same interview room at the Becker County Sheriff's Office beginning at approximately 1:30 p.m. on April 20, 2015. (Def.'s Ex. 2, 1; January 8, 2016, Motions Hearing, Digital Recording at 10:58:20 a.m.). Investigator Skoog later testified at the January 8, 2016, motions hearing that the circumstances under which the second interview took place were largely similar to the circumstances under which the first interview had taken place. (<u>Id.</u> at 10:58:40 a.m.).

Investigator Skoog began the interview by telling Defendant that his name had not yet been placed on the Becker County Sheriff's online "in custody" list so that no one would know that Defendant was being held. (Govt. Ex 12 at 00:30-00:39). Investigator Skoog also told Defendant that no one knew that he was "up here", to convey that Investigator Skoog was making efforts to ensure that others did not know that Defendant was possibly providing Investigator Skoog with information. (January 8, 2016, Motions Hearing, Digital Recording at 11:18:40 a.m.) The following exchange then occurred:

Skoog:     I just – there's a few things I want to clarify with you as far as have you ever did any of this kind of stuff before?

Defendant:     [Inaudible] like what?

Skoog:     Any – ever cooperated with law enforcement?

Defendant:     Somewhat, yeah.

(Govt. Ex. 12 at 00:40-00:55).

Investigator Skoog then read Defendant the <u>Miranda</u> warnings a second time and asked Defendant whether he had understood the warnings, to which Defendant again responded that he

had. (Id. at 00:55-1:37).   Investigator Skoog then asked Defendant whether he was willing to

speak with him, to which Defendant affirmatively responded, "Yup." (Id. at 1:38-1:42).

Investigator Skoog then asked, and Defendant answered, a series of questions about the

firearms that had been found in Defendant's possession, Defendant's activities on the previous

day, and individuals whom Defendant had mentioned during the first and second interviews. (Id.

at 1:43- 16:45).  The following exchange then occurred:

Defendant:    What – what's going to happen now? Cuz' I need know.

Skoog:        Well…

Defendant:    So I don't fuck around and do stupid [inaudible]

Skoog:        I'll talk to – I've talked with the county attorney or I will talk to'em.  You know,

              what's your criminal history look like?

Defendant:    Umm… [inaudible] and that's about it. Know what I mean?  Umm… I ain't

              [inaudible] do nothing stupid.  You know I ain't fuckin' [inaudible] go to prison,

              um [inaudible].

Skoog:        Are you looking at – are they looking to send you now?

Defendant:    Yeah just for a little violation for, ah, not staying in contact with my PO.

Skoog:        And you think they'll ship ya?

Defendant:    Um that all depends on what you guys do for me and what my PO will do for me.

              So that's all up to you guys, the county attorney, and you, and my attorn-attorney

              and my PO.

Skoog:        Yep, and you PO is Ringwelski? No.

Defendant:    Ah, no, ah, Margaret Lindquist.

Skoog:          Margaret Lindquist.  Well I'll start with calling her . . . I was, of course, it was a

                late night.  I …

(Id. at 16:46-17:48).

        Investigator Skoog then returned to asking a series of questions about Defendant's

activities selling narcotics, which Defendant answered. (Id. at 17:49-20:54).  The following

exchange then occurred:

Skoog:          Okay.  Well I'm gonna call her and see what I can do.  I'll let you know as soon

                as I can.  Right now you're gonna be on that DOC hold.  Okay?

                . . . . .

Defendant:      Wait so I know my DOC violation, but what's going on with [inaudible]

Skoog:          There was a warrant.

Defendant:      I know between you and me [inaudible]

Skoog:          Well, I gotta check with the county attorney.

Defendant:      But why – why you let me back in with the population over there [inaudible] then

                … then…

Skoog:          But – regardless with the DOC, I can't overrule them.

Defendant:      Yeah.

Skoog:          You'll have to be seen.  I'll talk with Margaret. Okay?

Defendant:      Listen, um, that's really not promising. So what you're basically saying is you're

                saying… you know [inaudible] back into population then [inaudible]

Skoog:          Well, I mean you can – I mean you can stay if you want, but I'm just saying if – if

                you go back, you're in on the DOC stuff.  You go – you go see Margaret and, ah,

                you know…

13

| Defendant: | Are you able to get her on the phone so I can talk to her, so I can see if I can be able to work for you guys for a little bit, because you – you put me out there, I can just be [inaudible] looking for [inaudible] and trying to catch… |
|---|---|
| Skoog: | And catch what? |
| Defendant: | And catch'em. |
| Skoog: | Well I – believe you can.  I – I got no question about that Billy.  I mean I – I got no question.  I've known ya enough that – known of you enough that I believe you're absolutely right. |

(Id. at 20:54-22:52).

Investigator Skoog then resumed asking Defendant a series of questions, which Defendant answered, about the bag that Defendant had been seen carrying when he ran away from the stop of the Tahoe he had been driving. (Id. at 22:53-24:10).  Approximately twenty-four minutes into the interview, Investigator Skoog terminated the interview, saying to Defendant, "All right.  Well, let's see what we can do." (Id. at 24:10).

After the second interview, Investigator Skoog returned Defendant to the Becker County Law Enforcement Center, where he was again placed in a holding cell. (See January 8, 2016, Motions Hearing, Digital Recording at 11:27:40 a.m.). Investigator Skoog also testified that he personally did not know whether Defendant had been given access to a telephone during this period. (Id. at 11:24:08 a.m.).

Following the second interview, Investigator Skoog contacted a county prosecutor about the possibility of pursuing a cooperation agreement with Defendant. (Id. at 11:35:00 a.m.). At the January 8, 2016, motions hearing, Investigator Skoog testified that none of the information about the other individuals provided by Defendant had been helpful to law enforcement. (Id. at

14

11:37:20 a.m.). Defendant's probation officer did ultimately also contact Investigator Skoog. (Id. at 11:21:18 a.m.). Investigator Skoog testified that he did not recall whether he had told Defendant's probation officer about Defendant's desire to cooperate with law enforcement. (Id. at 11:21:20 a.m.).

Investigator Skoog and Becker County Sheriff's Department Deputy Sheriff Mark Pinoniemi interviewed Defendant a third time on April 21, 2015, in the same interview room at the Becker County Sheriff's Office. (Def.'s Ex. 3, 1; January 8, 2016, Motions Hearing, Digital Recording at 10:59:00 a.m.). Investigator Skoog testified at the January 8, 2016, motions hearing that the circumstances under which the third interview took place were again largely similar to the circumstances under which the first interview took place. (Id. at 10:58:40 a.m.). Neither Investigator Skoog nor Deputy Sheriff Pinoniemi were in uniform; Investigator Skoog testified, however, both officers were armed during such interviews. (Id. at 11:17:30 a.m.-11:17:55 a.m.; 11:24:30 a.m.-11:24:45 a.m.).

Investigator Skoog and Deputy Pinoniemi began the interview by discussing personal property which had been seized during Defendant's arrest. (Govt.'s Ex. 13 at 00:00-1:30). Defendant then asked the officers what was going on. (Id. at 1:30). Investigator Skoog told Defendant that the Miranda warnings that he had previously read to Defendant earlier still applied to the interview, read Defendant the Miranda warnings a third time, and asked Defendant whether he understood the warnings, to which Defendant responded that he had. (Id. at 1:35-2:57). Investigator Skoog then asked Defendant whether he would speak to the officers, to which Defendant responded that he would. (Id. at 2:57-3:02).

Investigator Skoog then began confronting Defendant with information indicating that Defendant had been in possession of the firearms for longer than he had indicated in the earlier interviews. (Id. at 3:02-8:15). The following exchange then occurred:

Skoog:          I'm not – I'm not – what I – what I'm getting at is you're not being totally honest on the gun.

Defendant:      Well, I can't be totally honest with you until you're totally honest with me if you're going to help me or not, because I want to know if – if – if I'm gonna get help or not, you know?

(Id. at 8:16-8:27). Defendant then told Investigator Skoog that he was being honest with the officers and that he was ready to testify against other individuals. (Id. at 8:28-8:45). Investigator Skoog then terminated the interview. (Id. at 8:45-9:13).

Following the third interview, Defendant was returned to the Becker County Law Enforcement Center where he was placed in with the general population. (Id. at 11:27:40 a.m.).

On June 9, 2015, Defendant was indicted with the charges now pending against him. (Indictment, [Docket No. 1]). On December 7, 2015, Defendant filed the present second group of motions to suppress. (Def.'s Motion to Suppress Statements, [Docket No. 52]; Def.'s Motion to Suppress Fruits of Unlawful Search and Seizure, [Docket No. 53]).[4]

## II.   DEFENDANT'S MOTION TO SUPPRESS FRUITS OF UNLAWFUL SEARCH AND SEIZURE, [Docket No. 53]

Defendant moves the Court to suppress evidence obtained as the result of any and all unlawful searches and seizures of Defendant. However, the only arguments that Defendant offers in support of his motion are: (1) that the application for the tracking warrant obtained by SA Bennett on April 19, 2015, was not supported by probable cause because SA Bennett's affidavit in support of the application did not establish that the CI on whose information SA Bennett was seeking the warrant was reliable; and (2) that the Leon good faith exception does not apply to

---

[4] See, fn. 1, supra.

facts of the present case. (See Def.'s Motion to Suppress Fruits of Unlawful Search and Seizure,

[Docket No. 53], 1; Def.'s Memorandum in Support of Motion to Suppress, [Docket No. 54], 5-

8).

### A. Standard of Review

SA Bennett's application for a tracking warrant requested that the issuing State court

authorize numerous forms of electronic surveillance requiring varying levels of judicial review

before the requested surveillance method could be authorized.[5] Despite the varying standards

required to authorize the use of the tracking technologies requested by SA Bennett in his

application for the tracking warrant, the Court will analyze the sufficiency of the allegations in

SA Bennett's affidavit in support of his application for the tracking warrant only under the

probable cause standard, for the following three reasons. First, the issuing State District Court

Judge issued the warrant authorizing the use of the tracking technologies requested by SA

---

[5] SA Bennett requested that the warrant order the disclosure of telephone customer records, pursuant to 18 U.S.C. §§ 2703(c)(1)(B) and 2703(c)(2), and Minn. Stat. § 626A.36. (Govt. Ex 1, Application, at 1). The judicial role with regard to applications for authorization to collect such information is determining whether the applicant offered specific and articulable facts showing that there are reasonable grounds to believe that the information to be collected is relevant to an ongoing criminal investigation. 18 U.S.C. § 2703(d); Minn. Stat. § 626A.37. SA Bennett also requested that the warrant authorize the use of a mobile tracking device, specifically global positioning system (GPS) cellular phone technology, pursuant to 18 U.S.C. § 3117 and Minn. Stat. § 626A.36. (Govt. Ex 1, Application, at 1-2, 5). Under Minnesota law, the judicial role with regard to authorizing the use of such technology is to review whether the applicant has submitted information providing a reason to believe that the information likely to be obtained by the installation and use of the device is relevant to an ongoing criminal investigation. Minn. Stat. § 626A.37. Under federal law, the judicial role is to determine whether there is probable cause to use the tracking device. Federal Rule of Civil Procedure 41(d)(1); see also United States v. Moore, No. CR 15-116(1)&(2) (DWF/JSM), 2015 WL 8779926, at *3 (D. Minn. Dec. 15, 2015) (analyzing sufficiency of a warrant authorizing electronic tracking of the real-time location of a cellular telephone under the probable cause standard). SA Bennett also requested that the warrant authorize the use of cellular tower location and service information. (Govt. Ex 1, Application, at 1, 5). The federal courts are divided on the scope of judicial review with regard to applications to authorize the use of cellular tracking technology. Some courts, including at least one in this Circuit, have held that a court's role with regard to applications requesting authorization for cellular tracking requires only a determination whether the applicant made a showing of specific and articulable facts establishing that the suspect's cellular phone location information is relevant and material to an ongoing criminal investigation. See, e.g., In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 308 (3d Cir. 2010); United States v. Lopez-Acosta, No. 8:13CR275, 2014 WL 3828225, at *8 (D. Neb. Aug. 4, 2014). Other courts have required the applicant to demonstrate probable cause for the warrant to issue. See, e.g., In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info., 809 F. Supp. 2d 113, 127 (E.D.N.Y. 2011); In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F. Supp. 2d 526, 537 (D. Md. 2011).

Bennett on a finding that probable cause existed to believe that a crime was or was about to be committed by the person in possession of the cellular phones associated with the specific telephone numbers identified by the CI. (See Govt. Ex. 1, Order at 2). Second, probable cause is the most constitutionally stringent of the standards required to authorize the use of the varied tracking technologies requested by SA Bennett in his application, and as such, a determination that probable cause existed to issue the tracking warrant will necessarily mean that any of the less stringent standards were met. Finally, the Defendant has couched his challenge to the sufficiency of SA Bennett's affidavit in support of his search warrant application as a probable cause challenge.

"A search warrant is valid, under the Fourth Amendment, if the warrant is based on probable cause." United States v. Moore, No. CR 15-116 (1) & (2) (DWF/JSM), 2015 WL 8779926, at *3 (D. Minn. Dec. 15, 2015) (analyzing sufficiency of a warrant authorizing electronic tracking of the real-time location of a cellular telephone under the probable cause standard) (citing United States v. Caswell, 436 F.3d 894, 897 (8th Cir. 2006)). "An affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted); Moore, 2015 WL 8779926, at *3.

"Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether

probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of an affidavit in support of an application for a warrant is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005); edits in Wiley). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing court] had a 'substantial basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B.  Analysis**

In the present case, in his affidavit in support of the application for the tracking warrant, SA Bennett stated that a confidential informant ("CI") had provided information to Investigator Skoog indicating: that, within the twenty-four (24) hour period preceding SA Bennett submitting his application, the CI had seen Defendant in possession of a firearm and a quantity of methamphetamine; that Defendant had told the CI that he had active warrants for his arrest and

that he would make the police shoot him before he returned to prison; that the CI had used two specific phone numbers to speak with Defendant, which the CI provided to Investigator Skoog; and that the CI had used one of those telephone numbers to speak with Defendant shortly before SA Bennett applied for the tracking warrant. (Govt. Ex. 1, Application at 2-3). SA Bennett also indicated that Investigator Skoog had independently confirmed that Defendant had an active warrant for his arrest and that SA Bennett had confirmed that the telephone numbers provided by the CI were at that time associated with active accounts serviced by a cellular telephone service provider. (Id. at 3). Based on that information, a State District Court Judge of the Ninth Judicial District of the State of Minnesota concluded that probable cause existed to issue a warrant authorizing electronic tracking of the two telephones associated with the numbers provided by the CI. (Govt.'s Ex. 1, Order at 2).

The Court first considers whether the information provided by the CI, if reliable, would have provided the issuing State Court Judge with a substantial basis on which to conclude that probable cause existed to issue the tracking warrant. Possession of a methamphetamine is a crime. 21 U.S.C. § 844(a). Accordingly, assuming that the information provided by the CI was reliable, the CI's information that the CI had seen Defendant in possession of methamphetamine was sufficient to provide a substantial basis on which the issuing State Court Judge could conclude that probable cause existed to believe that Defendant had been committing a crime. Similarly assuming that the information provided by the CI was reliable, the fact that the CI had used the telephone numbers provided to Investigator Skoog to communicate with Defendant provided the issuing State Court Judge with a substantial basis on which to conclude that probable cause existed to believe that tracking the cellular telephones associated with the telephone numbers provided by the CI would reveal evidence of a crime. Further, the association

of the two cell phone numbers with Defendant pursuant to the information provided by the CI, if reliable, would have provided the issuing State Court Judge with a substantial basis on which to conclude that probable cause existed to issue the tracking warrant to locate Defendant who was the subject of existing and verified arrest warrants. Accordingly, upon reviewing the totality of the circumstances, the Court concludes that, if the representations of the CI were reliable, SA Bennett's affidavit in support of the application would have provided the issuing State Court Judge with a substantial basis on which to conclude that probable cause existed to issue a warrant authorizing electronic tracking of the telephones associated with the two telephone numbers provided by the CI.

Defendant, however, contends that SA Bennett's affidavit in support of the application for the warrant did not contain sufficient information to establish that the CI was in fact reliable. (Def.'s Memorandum in Support of Motion, [Docket No. 54] at 4-6). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir.1993)). Key to the present motion is the fact that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause." United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (quoting United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)).

In the present case, SA Bennett's affidavit in support of his application for the tracking warrant contained no indication that the CI had previously provided reliable information in the past. Accordingly, the Court must determine whether law enforcement independently corroborated the information provided by the CI so as to render the statements of the CI reliable.

"If [some] information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." Williams, 10 F.3d at 593-94 (citations omitted). In this case, the investigating officers were able to independently corroborate some of the most significant information provided by the CI, *i.e.*, that Defendant had active warrants for his arrest. Because the officers independently corroborated some of the information provided by the CI, the issuing State Court Judge had a substantial basis on which to infer that other information provided by the CI, although uncorroborated, was also reliable. Id. Accordingly, the Court concludes that the issuing State Court Judge had a substantial basis on which to conclude that the information provided by the CI was reliable and that probable cause existed to issue the State Court tracking warrant.

In addition, assuming solely for the sake of argument that SA Bennett's affidavit in support of the application for the warrant had not been sufficient to establish probable cause, the Court concludes that the officers relied in good faith on the probable cause determination by the issuing State Court Judge when executing the tracking warrant.

Although evidence obtained as a result of the execution of a warrant that was not supported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), "there is an exception for evidence obtained by an officer who relied in objective good faith on a search warrant." United States v. Koons, 300 F.3d 985, 990-91 (8th Cir. 2002) (citing United States v. Leon, 468 U.S. 897, 922 (1984)). Courts of this Circuit have applied the Leon good faith exception to tracking warrants authorizing the collection of location data from a suspect cellular phone. See, e.g., Moore, 2015 WL 8779926, at *3; United States v. Lopez-Acosta, No. 8:13CR275, 2014 WL 3828225, at *4 (D. Neb. Aug. 4, 2014).

"Under the <u>Leon</u> good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." <u>United States v. Grant</u>, 490 F.3d 627, 632 (8th Cir. 2007) (citing <u>United States v. Leon</u>, 468 U.S. 897, 898 (1984)).  Even if the Court were now to conclude that SA Bennett's affidavit in support of the application for the tracking warrant had not set forth facts within its "four corners" sufficient to demonstrate probable cause to authorize electronic tracking of the two telephones provided by the CI as being associated with Defendant, on the present record, law enforcement's good-faith reliance on the tracking warrant ultimately issued by the State District Court Judge militates against suppressing any evidence obtained as a result of the execution of the cellular tracking warrant. <u>See Leon</u>, 468 U.S. at 919-921 (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"). <u>See also</u> <u>United States v. Johnson</u>, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed.").

The Court's review of SA Bennett's affidavit indicates that the CI provided information indicating that the CI had personally witnessed Defendant in possession of a firearm and narcotics within twenty-four (24) hours of the warrant being obtained; that Defendant had admitted to the CI that there were active warrants for his arrest; that the CI had previously used the two provided telephone numbers to converse with Defendant; and that the CI had communicated with Defendant using one of those telephone numbers shortly before the warrant was obtained.  In addition, before the warrant was issued, the officers had corroborated portions

of the information that had been provided by the CI, *i.e.*, the existence of an active arrest warrant for Defendant and the active status of the telephone numbers provided by the CI.  Further, after the warrant was issued, the officers continued to independently corroborate other information provided by the CI.  Following the issuance of the warrant, the CI contacted Investigator Skoog and told him that Defendant was at a trailer home located at lot 17 in the Country Manor Trailer Park and that Defendant may be driving a Chevy Tahoe. When the officers arrived at the trailer home identified by the CI, the officers saw that a Chevy Tahoe was indeed parked at the residence.

The officers then used the tracking technology authorized by the State Court warrant to verify that the telephones identified by the CI were at the trailer home at lot 17. Accordingly, when executing the State Court tracking warrant to confirm the location of the cellular telephones associated with the telephone numbers provided by the CI, Investigator Skoog and SA Bennett relied in good faith on the earlier determination of probable cause that had been made by the issuing State District Court Judge. On the present totality of the circumstances, it cannot be said that the executing officers unreasonably relied on the tracking warrant issued by the State Court to locate the two cellular telephones associated with Defendant.

Based on all of the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Fruits of Unlawful Search and Seizure, [Docket No. 53].

## III.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, [Docket No.52]

Defendant also moves the Court to suppress the statements he made during the first, second, and third interviews. (Def.'s Motion to Suppress Statements, [Docket No. 52]).

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). Notably, it is well-settled that a defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

## B. Analysis

As a threshold matter, there is no dispute that Defendant was in custody or that Defendant was being interrogated when he made the statements that he now seeks to suppress. Similarly, there is no dispute that Defendant was read the Miranda warnings multiple times, had indicated after each reading that he had understood those warnings, and when asked, each time he indicated that he was willing to talk to law enforcement. Accordingly, the motion now before the Court calls upon it to determine whether Defendant's waiver of his Miranda rights when making the statements that he now seeks to suppress was valid.

The validity of a Miranda waiver requires consideration of two distinct inquiries, whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The

government has the burden of proving the validity of the <u>Miranda</u> waiver by a preponderance of the evidence." <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004).

1. <u>Knowing and Intelligent</u>

"As a general matter ... an accused who is admonished with the warnings prescribed by [the] Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one[.]" <u>United States v. Garlewicz</u>, 493 F.3d 933, 936 (8th Cir.2007).  In the present case, Defendant was read the <u>Miranda</u> warnings multiple times, and he affirmatively represented each time that he had understood those rights.  Accordingly, the Court concludes that Defendant's waiver of his <u>Miranda</u> rights was done knowingly and intelligently.

2. <u>Voluntary</u>

By his present motion the Defendant contends, however, that his waiver of his <u>Miranda</u> rights was not voluntarily made; arguing that it was the product of the circumstances surrounding the interrogations amounting to express and implied promises of leniency to be obtained by cooperating with law enforcement.

"Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker." <u>Vinton</u>, 631 F.3d at 482 (internal quotation marks and citation omitted). "A statement is not considered involuntary unless 'the police extorted it from the accused by means of coercive activity.'" <u>Id.</u> (quoting <u>Jenner v. Smith</u>, 982 F.2d 329, 333 (8th Cir. 1993)).  Accordingly, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises <u>sufficient to overbear the defendant's will and critically impair his capacity for self-determination</u>." <u>United States v.</u>

LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (citing Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir.), cert. denied, 534 U.S. 924 (2001)) (emphasis added). A court determines whether a statement was made involuntarily by examining the totality of the circumstances, including the conduct of the officers and the characteristics of the accused, to determine whether the defendant's will was overborne to the point that his capacity for self-determination was incapacitated. Id. (citing Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001)).

The record presently before the Court indicates that the interviewing officers did not make either any express or implied promises of leniency to Defendant to obtain his statements. Rather, during the first interview, immediately after Investigator Skoog read Defendant the Miranda warnings, Defendant himself first offered to provide information in return for help. At that point, Investigator Skoog indicated only that he needed to know what information Defendant possessed before he could entertain the possibility of Defendant cooperating with law enforcement. Investigator Skoog then asked, and Defendant answered a number of questions. This pattern continued throughout the first interview, as well as, into the second. Defendant on several occasions initiated the conversation by which it was he who sought an indication from Investigator Skoog that he would in fact be able to cooperate with law enforcement in exchange for leniency in some form, to which Investigator Skoog never said Defendant would be allowed such leniency in fact. Those exchanges were then followed with Investigator Skoog asking, and Defendant voluntarily answering more questions.

Near the end of the second interview, Investigator Skoog responded to Defendant's request for an indication that Defendant would be able to cooperate with law enforcement in exchange for leniency by indicating that he would talk to Defendant's probation officer and to the prosecuting county attorneys regarding Defendant's desire to cooperate with law

enforcement. Notably, the Eighth Circuit has held that a law enforcement officer's statement that he would report a defendant's cooperation to appropriate authorities, such as pre-trial services and the court, does not constitute a sufficient inducement to render subsequent incriminating statements involuntary. See United States v. Jacks, 634 F.2d 390, 393 (8th Cir. 1980) (citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)). Accordingly, the Court finds that the officers in the present case, in order to obtain Defendant's statements, did not make any express or implied promises that Defendant would in fact be able to obtain a cooperation agreement with law enforcement. A review of the interviews themselves demonstrates, on the totality of the circumstances, that it was Defendant's own repeated attempts to get Investigator Skoog to state affirmatively that Defendant would be able to get a cooperating agreement with law enforcement which supports the Court's conclusion that Defendant made the statements that he now seeks to suppress in the self-motivated hope of obtaining a promise of leniency, not as a result of any promise of leniency that had actually been made. The Court's close review of the record presently before it also indicates that the officers were at no time violent with Defendant and made no threats against him during the interviews. See United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

Defendant nevertheless asserts that, at the end of the second interview, Investigator Skoog stated that he believed and had no doubt that Defendant would be able to have a cooperation agreement with law enforcement. (See Def.'s Memo in Support of Motion, [Docket No. 72], 12). The Court's careful review of the audio recording of the interview indicates that the Investigator Skoog was in fact expressing his belief that Defendant had abilities and information that might be of use to law enforcement, however, Investigator Skoog did not

express a belief that Defendant would be given leniency by the county prosecutor through a cooperation agreement. (See Govt. Ex. 12 at 20:54-22:52).

Defendant also asserts that the Investigator Skoog used coercive tactics by telling him that the officers would not use his information and that the interview was not being recorded. However, "[t]actics such as deception … do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) (emphasis added).   In the present case, the Court's review of the totality of the circumstances shown in the record does not indicate that Investigator's Skoog's misrepresentations in any way overbore Defendant's will.   Even after Investigator Skoog made those misrepresentations, it is evident that it was Defendant who continued to initiate and press the conversations with Investigator Skoog by which Defendant sought an indication that he would receive some leniency. In fact, the audio interview shows that in his efforts to secure an affirmative promise of leniency from law enforcement, the Defendant indicated that that he was not going to reveal all of the information that he possessed if he wasn't going to be able to obtain a cooperation agreement with law enforcement. (See Govt. Ex 11 at 6:55-7:24, 17:58-18:30; see also Govt. Ex 13 at 8:16-8:27).   This shows, on the present record, that Defendant's will was not overborne nor was his capacity for self-determination critically impaired.

Numerous other factors also weigh in favor of finding that Defendant's waiver in the present case was voluntary. The officers did not withhold anything from Defendant, and, in fact, they provided him with water when he asked for it. See Williams v. Norris, 576 F.3d 850, 869 (8th Cir. 2009) (affirming finding that Miranda waiver had been voluntary where, among other factors supporting the determination, the defendant had been provided with food and water). The

officers also conducted the interview in a conversational tone. See United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors supporting the determination, interview was conducted in a reasonable, conversational tone). The first and second interviews, which each lasted only twenty-four (24) minutes, and the third interview, which lasted only slightly more than nine (9) minutes, were also not coercive in their duration. See Id. (noting that interrogation lasting more than two hours was not coercive in duration). Further, there is nothing in the present record to indicate that the environmental conditions for the interviews contributed to creating any sort of a coercive effect.

Defendant's personal characteristics also weigh in favor of a finding that he made his challenged statements voluntarily. The record presently before the Court indicates that Defendant has had previous experience with law enforcement, including previous felony convictions, and by his own claims to Investigator Skoog, he had even previously engaged in some cooperation with law enforcement. "A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary." Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (citing United States v. Griffith, 533 F.3d 979, 984–85 (8th Cir.2008)).

Defendant lastly asserts conclusorily in his written papers only that he was "coming down" from narcotics during the first interview as a basis for his position that his statements were made involuntarily. (See Def.'s Memo in Support of Motion, [Docket No. 72], 10). However, the only basis for that assertion that appears in the hearing record is an argument made by Defendant's counsel at the motions hearing. The statements of counsel are not evidence. See United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985) (noting with approval as a proper jury instruction that statements and arguments of counsel are not evidence in a case). As such,

there is no evidence in the record presently before the Court that Defendant had, in fact, been under the influence of narcotics while or in the hours before he was arrested on April 20, 2015, . Even assuming solely for the sake of argument Defendant had been under the influence of intoxicants during the interview, intoxication does not *per se* render a statement made involuntary. United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008). Rather, the question is whether any asserted intoxication overbore Defendants' will. Id. As noted above, the Court's review of the totality of the circumstances in the record indicates that neither Defendant's will nor his capacity for self-determination were overborne during any of the interrogations at issue in the present motion.

Based on all of the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements. [Docket No. 52].

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, [Docket No. 52], be **DENIED** as set for above; and,

2. Defendant's Motion to Suppress Unlawful Search and Seizure, [Docket No. 53], be **DENIED** as set forth above.

Dated: February 11, 2016                              s/Leo I. Brisbois
                                                      Leo I. Brisbois
                                                      U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.